BARBARA SIMPSON, EXECUTRIX OF THE ESTATE OF WILLIAM SIMPSON, M.D. v. HATTERAS ISLAND GALLERY RESTAURANT, INC. v. WILLIE R. ETHERIDGE SEAFOOD CO., INC.

No. 9227SC51

(Filed 16 March 1993)

1. **Food § 1 (NCI3d) — tuna eaten in restaurant — death from poisoning — implied warranty of merchantability — breach by tuna supplier**

    The evidence in a wrongful death action was sufficient to support the jury verdict finding that defendant tuna supplier breached its implied warranty of merchantability when it sold tuna to a restaurant where it tended to show that decedent became ill after eating tuna at the restaurant; decedent died as a result of scombroid fish poisoning, which results from elevated levels of histamine in the scombroid fish family; an autopsy revealed no other explanation for decedent's death; the restaurant purchased the tuna from defendant supplier in the form of four loins; the histamine level in tuna immediately after it is caught is not above one milligram per 100 grams of fish tissue; a level of ten milligrams or more of histamine per 100 grams of fish is an indication that the fish has been temperature abused and mishandled; the restaurant stored, handled, and prepared the tuna properly; after decedent's death, three tuna loins remained in the refrigeration units of the restaurant; and the histamine levels of those loins were 4.16, 7.96 and 13.73 milligrams per 100 grams of fish.

    **Am Jur 2d, Food §§ 84, 89, 93-96, 100, 103, 105.**

    **Liability for injury or death allegedly caused by spoilage, contamination or other deleterious condition of food or food product. 2 ALR5th 1.**

2. **Indemnity § 2 (NCI4th) — death from tuna poisoning — no negligence by restaurant or supplier — failure to submit indemnity issue — harmless error**

    In an action for wrongful death allegedly caused by poisoning from tuna consumed in defendant restaurant, the trial court's failure to instruct and submit an issue on defendant restaurant's claim against defendant tuna supplier for indemnity with respect to the issue of negligence was harmless where

SIMPSON v. HATTERAS ISLAND GALLERY RESTAURANT

[109 N.C. App. 314 (1993)]

the jury found no negligence by either defendant and thus would not have reached the issue of indemnity.

**Am Jur 2d, Indemnity §§ 15 et seq.**

**Validity, construction, and effect of agreement, in connection with real estate lease or license by railroad, for exemption from liability or for indemnification by lessee or licensee for consequences of railroad's own negligence. 14 ALR3d 446.**

**Subrogation of employer's liability insurer to employer's right of indemnity against negligent employee. 55 ALR3d 631.**

3. **Food § 3 (NCI3d) — death from tuna poisoning — implied warranty of merchantability — breach by restaurant and supplier — primary and secondary liability — restaurant's right to indemnity by supplier**

In an action for wrongful death allegedly caused by poisoning from tuna eaten in defendant restaurant, defendant restaurant was entitled to indemnification from defendant tuna supplier as a matter of law, and the trial court did not err in failing to submit a separate issue to the jury on indemnification with regard to defendant's breach of warranty of merchantability, where the jury found that both the restaurant and the tuna supplier breached the warranty of merchantability of the tuna; the jury found that the restaurant was not negligent in preparing the tuna and thus effectively found that the restaurant had not tampered with or contaminated the tuna in any way; the liability of the restaurant is analogous to the liability of a retailer selling a product in a sealed container; any breach by the restaurant necessarily derives from the supplier's original breach; and the breach of warranty by the supplier is primary and that of the restaurant is secondary.

**Am Jur 2d, Food § 97; Indemnity §§ 19, 20, 25.**

**Products liability: seller's right to indemnity from manufacturer. 70 ALR4th 278.**

4. **Limitations, Repose, and Laches § 150 (NCI4th) — addition of party defendant — motion to amend before limitation expired — ruling on motion after expiration**

Plaintiff's wrongful death action against a food supplier was not barred by the two-year statute of limitations where

plaintiff filed a motion to amend the complaint to add the supplier as a defendant within the two-year period but the motion was heard and allowed after the limitation period had expired, since the relevant date for measuring the statute of limitations is the date of the filing of the motion to amend, not the date the court rules on that motion.

**Am Jur 2d, Limitation of Actions §§ 232 et seq.; see Am Jur 2d, Limitation of Actions §§ 217 et seq.**

Judge GREENE concurring.

Appeal by third-party defendant from Judgment entered 12 July 1991 by Judge John Mull Gardner in Cleveland County Superior Court. Heard in the Court of Appeals 10 December 1992.

*Hedrick, Eatman, Gardner & Kincheloe, by Gregory C. York and G. Lee Martin, for third-party plaintiff.*

*Waggoner, Hamrick, Hasty, Monteith, Kratt & McDonnell, by S. Dean Hamrick and Michael J. Rousseaux, for third-party defendant.*

WYNN, Judge.

This appeal arises from a personal injury and wrongful death action brought by the plaintiff, Barbara Simpson, originally against the defendant and third-party plaintiff, Hatteras Island Gallery Restaurant, Inc. [hereinafter Restaurant], for the death of her husband, Dr. William Simpson. Dr. Simpson's death was determined to be the result of scombroid fish poisoning, which results from elevated levels of histamine in the scombroid fish family, allegedly incurred from his eating tuna at the Restaurant.

Mrs. Simpson filed her complaint against the Restaurant on 29 September 1989, claiming causes of action in negligence and breach of warranty of merchantability. The Restaurant subsequently filed a third-party complaint for indemnity against the Willie R. Etheridge Seafood Co., Inc. [hereinafter Etheridge] as the supplier of the tuna served to Dr. Simpson, and Mrs. Simpson was permitted to amend her complaint to file a direct action against Etheridge.

At trial, after the close of all the evidence, Etheridge moved for a directed verdict, which motion was denied. The jury then

SIMPSON v. HATTERAS ISLAND GALLERY RESTAURANT

[109 N.C. App. 314 (1993)]

returned a verdict indicating that neither Etheridge nor the Restaurant was negligent in its handling of the tuna, and that both Etheridge and the Restaurant had breached an implied warranty of merchantability in their respective sales of the tuna. Because of the breach of warranty, the jury found that Mrs. Simpson was entitled to recover damages in the amount of $400,000.

On 24 May 1991 Etheridge filed a motion for a judgment notwithstanding the verdict. That motion was denied and on 12 July 1991, the trial court entered a written judgment on the verdict against Etheridge and the Restaurant in the total amount of $400,000 and entered a judgment against Etheridge in favor of the Restaurant in the amount of $400,000. Following the judgment, the Restaurant paid $400,000 to Mrs. Simpson, and thus neither Mrs. Simpson nor the Restaurant appealed the judgment. However, Etheridge gave notice of appeal on 31 July 1991.

I.

The third-party defendant, Etheridge, first assigns error to the trial court's denial of its motion for a directed verdict and subsequent motion for a judgment notwithstanding the verdict. Etheridge argues that the evidence is too remote and speculative to support a finding by the jury that Etheridge breached its implied warranty of merchantability. We disagree.

The issue presented by a motion for a directed verdict is whether the evidence is sufficient to go to the jury. The trial court, in ruling on such a motion, must examine the evidence in a light most favorable to the non-moving party, drawing all reasonable inferences from that evidence and resolving all discrepancies in favor of the non-movant. *Goodman v. Wenco Foods, Inc.*, 333 N.C. 1, 9, 423 S.E.2d 444, 447 (1992). A motion for a judgment notwithstanding the verdict essentially requests that judgment be entered in accordance with an earlier requested motion for a directed verdict, despite a contrary verdict entered by the jury. Testing the sufficiency of the evidence in such a motion involves a process identical to that for a directed verdict. *Taylor v. Walker*, 320 N.C. 729, 733-34, 360 S.E.2d 796, 799 (1987).

The sale of food or drink constitutes a sale of goods, and a warranty of merchantability is implied in all contracts for the sale of goods. *See* N.C. Gen. Stat. § 25-2-314(1) (1986). In order for a jury to find a breach of this implied warranty of merchantabili-

ty the purchaser must prove (1) that the goods in question were subject to the implied warranty of merchantability, (2) that the goods were defective at the time of the sale, and as such did not comply with the warranty, (3) that the resulting injury was caused by the defective nature of the goods, and (4) that damages were suffered. *Goodman*, 333 N.C. at 10, 423 S.E.2d at 447-48.

The important issue in determining the defective nature of a food product is whether an ordinary consumer would expect the defect to be present and, thus, take precautions to avoid injury from that defect. *Id.* at 15, 423 S.E.2d at 450-51 (*Goodman* represents a clarification of the standard for determining whether a food product is defective at the time of sale such that it breaches the implied warranty of merchantability, and the Court steered away from an analysis based on whether the defect is natural or foreign to the product in question). Whether the defect should reasonably be expected by the ordinary consumer is usually a question for the jury. *Id.* at 16, 423 S.E.2d at 451.

[1] The evidence presented at trial, viewed in a light most favorable to the non-movants, tended to show the following: Dr. Simpson was an active individual with no physical health problems that would prevent him from engaging in physical activity. Both Dr. Simpson and Mr. James Havens ate tuna at the Restaurant on the night of Dr. Simpson's death. Prior to dinner, Dr. Simpson had exhibited no signs of illness or stomach problems. Upon returning from dinner, Dr. Simpson was very flushed and began experiencing shortness of breath, a rapid pulse, vomiting and diarrhea. Mr. Havens also became ill, his face, neck and ears were extremely flushed, his pulse was rapid, he became nauseated, and his ileostomy bag began to fill rapidly, an indication of diarrhea. Medical testimony indicated that Dr. Simpson died as a result of scombroid fish poisoning, the most striking characteristic of such poisoning being red or flushed coloring. The report of the autopsy on Dr. Simpson's body concluded that signs of other causes of death, such as a heart attack, blood clots, or acute bleeding into the brain were nonexistent and no explanation other than scombroid fish poisoning could be found for Dr. Simpson's death. There was also testimony that the histamine level in tuna immediately after it is caught is not above one milligram per 100 grams of fish tissue, and a level of ten milligrams or more of histamine per 100 grams of fish is an indication that the fish has been temperature abused and mishandled. The Restaurant purchased the tuna in question from Etheridge,

receiving it in sealed plastic cryovak bags, and placed it in the freezer without breaking the seals. In preparing the tuna to be served, the employees of the Restaurant followed proper procedures, washing their hands and cleaning their knives in bleach before and after cutting the tuna into steaks. All refrigeration units in the Restaurant were in proper working condition. The tuna had been received by the Restaurant from Etheridge in the form of four loins. After Dr. Simpson's death, there were three loins remaining in the refrigeration units at the Restaurant, and tests indicated the histamine levels to be 4.16 milligrams, 7.96 milligrams, and 13.73 milligrams per 100 grams of fish.

Etheridge contends in its brief that "[i]n order to establish liability on . . . [its part], there must be a showing by more than mere conjecture and speculation that at the time the tuna left . . . [its] possession eleven days prior to Dr. Simpson's death, the fresh tuna sold by it contained more than 50 milligrams of histamine per 100 grams of fish." This contention is based on testimony by Dr. Stephen Taylor that, in his opinion, if Dr. Simpson died of scombroid fish poisoning he would have had to have ingested more than 50 milligrams of histamine per 100 grams of fish. Dr. Taylor's testimony does not, however, clearly establish the level of histamine necessary to render tuna unmerchantable. In fact, Dr. Taylor's indication that a histamine level of ten milligrams per 100 grams of fish is evidence of temperature abuse and mishandling supports the conclusion that food products with this level of histamine exceed the standard of merchantability. This evidence was properly presented to the jury so that it could evaluate the testimony of Dr. Taylor and the other witnesses, weigh the evidence regarding the circumstances surrounding Dr. Simpson's death, consider the evidence of the histamine levels in the other tuna received by the Restaurant, and come to a conclusion regarding the merchantability of the tuna sold by Etheridge to the Restaurant and ultimately served to Dr. Simpson, based on the expectations of a reasonable consumer. We therefore find that the evidence viewed in a light most favorable to the non-moving parties warranted its submission to the jury, and further that the evidence was sufficient to uphold the jury verdict that Etheridge breached an implied warranty of merchantability when it sold the tuna to the Restaurant.

## II.

Etheridge next assigns error to: (1) the trial court's failure to submit an issue on the Restaurant's claim for indemnification

against Etheridge and (2) the trial court's failure to instruct the jury that a finding that both Etheridge and the Restaurant breached a warranty of merchantability would result in the court entering judgment for the entire amount of Mrs. Simpson's damages against Etheridge.

The trial judge refused Etheridge's request to submit an issue regarding indemnification to the jury. Instead, the jury was presented with four questions: (1) Was the death of William Simpson caused by the negligence of the defendant, Gallery Restaurant? (2) Was the death of William Simpson caused by the negligence of the defendant, Etheridge Seafood? (3) Did the Gallery Restaurant breach an implied warranty of merchantability to William Simpson that the tuna was not injurious to human health, resulting in the death of William Simpson? and (4) Did Etheridge Seafood breach an implied warranty of merchantability to William Simpson that the tuna was not injurious to human health, resulting in the death of William Simpson? The jury answered "No" to the first two questions, finding neither Etheridge nor the Restaurant liable to Mrs. Simpson in negligence, and "Yes" to the third and fourth questions, finding both liable for breach of an implied warranty of merchantability. With regard to the third and fourth issues, the jury had been instructed as follows:

> The third issue, did the Gallery Restaurant breach an implied warranty of merchantability to William Simpson that the tuna was not injurious to human health, resulting in the death of William Simpson?

> Issue four, did Etheridge Seafood breach the implied warranty of merchantability to William Simpson that the tuna was not injurious to human health, resulting in the death of William Simpson?

> The burden of proof on each of these two issues is on the plaintiff. This means that as to each issue, for you to find in favor of the plaintiff, she must prove by the greater weight of the evidence the following three things:

> First, that there was an implied warranty of merchantability that the food would not be injurious to human health.

> Second, that the implied warranty was breached.

And third, that *William Simpson died as a proximate result of the breach.*

* * * *

Finally, as to the third issue, I instruct you that if the plaintiff has proved by the greater weight of the evidence that there was an implied warranty of merchantability that the food would not be injurious to human health, that the warranty was breached and that the breach was the proximate cause of William Simpson's death, then you would answer the issue "yes" in favor of the plaintiff.

On the other hand, if you fail to so find, then you would answer this issue "no" in favor of the defendant, Gallery Restaurant.

As to the fourth issue, I instruct you that if the plaintiff has proved by the greater weight of the evidence that there was an implied warranty of merchantability and that the food — that the food would not be injurious to human health, that the warranty was breached, *that the breach was the proximate cause of William Simpson's death,* then you would answer this issue "yes" in favor of the plaintiff.

On the other hand, if you fail to so find, then you would answer this issue "no" in favor of the defendant, Etheridge Seafood.

(Emphasis added).

The jury further assessed a total of $400,000 in damages against Etheridge and the Restaurant. The trial judge then ordered Etheridge to pay $400,000 to the Restaurant, effectively granting a directed verdict in favor of the Restaurant on the issue of indemnification. The issue we must decide, then, is whether the Restaurant was entitled to indemnification as a matter of law.

[2]   Etheridge contends that the trial court should have presented the jury with the issue of indemnification and that the jury should have been instructed regarding that issue. We agree that it was error for the trial judge not to instruct on indemnity, but only in light of the *negligence* issues. Generally joint tort-feasors are not entitled to indemnity from one another. *Nationwide Mutual Ins. Co. v. Chantos,* 293 N.C. 431, 442, 238 S.E.2d 597, 604 (1977), *appeal after remand,* 298 N.C. 246, 258 S.E.2d 334 (1979). An excep-

SIMPSON v. HATTERAS ISLAND GALLERY RESTAURANT

[109 N.C. App. 314 (1993)]

tion to that rule provides, however, that "a party secondarily liable is entitled to indemnity from the party primarily liable even where both parties are denominated joint tort-feasors." *Id.* This concept of primary-secondary liability is illustrated where "the active negligence of one tort-feasor and the passive negligence of another combine to proximately cause injury to a third party, the passively negligent tort-feasor who is compelled to pay damages to the injured party is entitled to indemnity from the actively negligent tort-feasor." *Id.* Thus, in the present case, if the jury had returned a verdict finding both the Restaurant and Etheridge negligent in proximately causing Dr. Simpson's death, then the jury would have to have determined further whether the Restaurant's negligence constituted "passive negligence" which merely derived from the active negligence of Etheridge, or if the Restaurant had also been actively negligent such that it was not entitled to indemnity for paying its share of the joint and several judgment. However, the jury in this case returned a verdict of no negligence on the part of either party. Because the jury found no negligence, it would not have reached the issue of indemnification. We, therefore, find that the failure to instruct on indemnity with regard to the issue of negligence was harmless error.

[3] Etheridge further argues that the trial court erred in failing to instruct on indemnity with regard to the breach of warranty issues. We disagree. When goods are sold to a dealer with a warranty, it is assumed that the dealer can resell them to his customers with a similar warranty. *Davis v. Radford*, 233 N.C. 283, 286, 63 S.E.2d 822, 825 (1951); *Aldridge Motors, Inc. v. Alexander*, 217 N.C. 750, 755, 9 S.E.2d 469, 472-73 (1940) (citing Williston on Contracts). Accordingly, if such sales occur and the customer recovers damages from the dealer, the latter has a *prima facie* right to recover those damages against the original supplier of the goods. *Davis*, 233 N.C. at 286, 63 S.E.2d at 825; *Alexander*, 217 N.C. at 755, 9 S.E.2d at 473. The *Davis* Court articulated that rule in the context of food sold for human consumption as follows:

> [W]here the distributor or wholesale dealer sells to the retail dealer articles in original packages for human consumption with warranty of wholesomeness and the retail dealer sells under the same warranty to a customer, for the injury resulting the retail dealer may properly charge the wholesaler with *primary liability* for the loss sustained.

*Davis*, 233 N.C. at 287, 63 S.E.2d at 826 (emphasis added).

SIMPSON v. HATTERAS ISLAND GALLERY RESTAURANT

[109 N.C. App. 314 (1993)]

The concept of primary-secondary liability, as discussed *supra* with regard to negligence, is illustrated in breach of warranty cases such as *Davis*, where the product at issue was in a sealed container. In instances where the product comes from a supplier in a sealed container, and the seller has not removed the product from its sealed package, it necessarily passes to the customer in exactly the same form in which it originally came from the supplier. Therefore, if the supplier has breached a warranty of merchantability, the retailer necessarily also breaches a warranty of merchantability. The retailer, however, has done nothing except act as a middleman and any liability it incurs for a customer's damages is merely derived from the supplier's original breach of warranty.

In situations such as the case at bar, however, where the retailer removes the product from its sealed package to prepare it for sale to a customer, the retailer may be subject to liability independent of the supplier's liability. That is, if the supplier had breached no warranty in its sale to the retailer but the retailer had, for instance, been negligent in its handling of the product and in some way contaminated it, the retailer would have breached a warranty of merchantability to the customer independent of any action by the supplier. In the case at bar, Etheridge impliedly warranted that the tuna was fit for human consumption. The Restaurant relied on that warranty and prepared the tuna for sale to Dr. Simpson. The jury found that the Restaurant was not negligent in preparing the tuna, effectively finding that the Restaurant had not tampered with or contaminated the tuna in any way. Therefore, the liability of the Restaurant is analogous to the liability of a retailer selling a product in a sealed container.

The jury in this case was afforded an opportunity to find that either the Restaurant or Etheridge had breached the warranty of merchantability, *or* that both of those entities had breached the warranty. Had the jury chosen to find that only one of the parties had breached the warranty, then no issue of primary and secondary liability, and thus no issue of indemnity, would exist. The jury found, however, that *both* the Restaurant and Etheridge had breached their respective warranties. The instructions indicate that each such breach was the proximate cause of Dr. Simpson's death. It follows that, based on the jury determination that Etheridge breached a warranty of merchantability which breach was the proximate cause of Dr. Simpson's death, any breach by the Restaurant necessarily derives from Etheridge's original breach.

We conclude that, while the Restaurant's breach of warranty of merchantability is separate and distinct from Etheridge's breach of the warranty of merchantability, in accordance with the jury instructions only one such breach was necessary to cause Dr. Simpson's death. Accordingly, the Restaurant, having committed the secondary breach, is entitled to indemnification from the primary obligor, Etheridge, as a matter of law.

We note in passing that the concurring opinion, in essence, concludes that the record reflects no evidence of negligence on the part of the Restaurant. In light of the jury's unchallenged resolution of the negligence issue, however, we find it unnecessary, and in fact impermissible, to examine the record for evidence of the Restaurant's lack of reasonable care in its handling of the tuna.

## III.

[4] Etheridge next assigns error to the trial court's failure to dismiss Mrs. Simpson's claim against it and its failure to enter a judgment notwithstanding the verdict on the grounds that the claim was barred by the two-year statute of limitations. In support of this contention, Etheridge argues that Mrs. Simpson's amendment to her complaint against the Restaurant to include Etheridge Seafood as a defendant was allowed after the two year period had expired and did not act to relate back to the original claim. We find no merit to this contention.

Etheridge argues that the requirements for an amendment to relate back to the original complaint are not met in the present case. The relation back principle, however, only applies where the complaint is amended outside the relevant statute of limitations. It need not be considered where a pleading is amended before the statute of limitations expires.

In the present case, because a responsive pleading had already been entered, Mrs. Simpson could only amend her complaint by leave of the court. She filed a motion to amend, and an amended complaint, on 6 April 1990, which date was within the two year statute of limitations. The motion was scheduled to be heard first on 23 April 1990 and again on 11 June 1990, but was continued from both dates at the request of Etheridge's counsel. Consequently, the motion was not heard and the Order allowing the amendment to the complaint was not entered until 12 November 1990, which date was after the two-year statute of limitations had expired.

SIMPSON v. HATTERAS ISLAND GALLERY RESTAURANT

[109 N.C. App. 314 (1993)]

The relevant date for measuring the statute of limitations where an amendment to a pleading is concerned, however, is the date of the *filing of the motion*, not the date the court rules on that motion. *Mauney v. Morris*, 316 N.C. 67, 71, 340 S.E.2d 397, 400 (1986). "The timely filing of the motion to amend, if later allowed, is sufficient to start the action within the period of limitations." *Id.*

Thus, we find no merit to Etheridge's claim that the cause of action against it was barred by the statute of limitations.

IV.

We have examined the third-party defendant's final assignment of error and find it to be without merit.

For the foregoing reasons the decision of the trial court is,

Affirmed.

Judge Cozort concurs.

Judge Greene concurs with separate concurring opinion.

Judge GREENE concurring.

I agree with the majority that, under the facts of this case, the trial court did not err in refusing to submit a separate issue to the jury on indemnification with regard to the defendants' breach of warranty. I reach this result, however, for somewhat different reasons.

In order to recover indemnity from Etheridge Seafood, the supplier of the fish, Hatteras Restaurant, the retailer of the fish, must allege and prove (1) that the supplier is liable to the plaintiff, and (2) that the retailer's liability to the plaintiff is derivative, that is, based solely upon the breach of the supplier. *See Kim v. Professional Business Brokers Ltd.*, 74 N.C. App. 48, 51, 328 S.E.2d 296, 299 (1985). A retailer's liability for breach of the implied warranty of merchantability is derivative if the retailer (1) acquires and sells a product in a sealed container, provided that the retailer does not damage or mishandle the product while it is in his possession, or (2) acquires and sells a product under circumstances in which he was afforded no reasonable opportunity to inspect the product in such a manner that would have or should have, in the

exercise of reasonable care, revealed the existence of the condition complained of, again provided that the retailer does not damage or mishandle the product while in his possession. N.C.G.S. § 99B-2(a) (1989); *see also Morrison v. Sears, Roebuck & Co.*, 319 N.C. 298, 303, 354 S.E.2d 495, 498-99 (1987). The retailer's liability is not derivative, and therefore is independent, if the retailer (1) acquires a product in a sealed container, but damages or mishandles the product before selling it, or (2) because of a failure to use reasonable care, fails to discover a defective condition in a product acquired from a supplier which a reasonable inspection would have revealed, or damages or mishandles the product while it is in his possession. *Id.*

In the instant case, the "sealed container" defense to breach of the implied warranty of merchantability, *see Morrison*, 319 N.C. at 303, 354 S.E.2d at 498-99, has no application. The restaurant after acquiring the fish from Etheridge froze it, thawed it, marinated it, put it on ice, then cooked and served it to Dr. Simpson. Rather, the restaurant's independent liability for breach of implied warranty depends on whether the restaurant was afforded a reasonable opportunity to inspect the fish in a manner that would have or should have, in the exercise of reasonable care, revealed the toxicity level of the fish, or, if not, whether the restaurant mishandled or damaged the fish while it was in its possession. Based upon my reading of the record, there is no evidence that the restaurant damaged or mishandled the fish such that it contributed to or increased its defective condition. In addition, the evidence indicates that no reasonable inspection would have revealed the deadly defect. There is no evidence that the elevated histamine level produced any unusual odor, color, or texture. Accordingly, there was no substantial evidence requiring submission to the jury of a separate issue of indemnity on the breach of warranty issues, as all of the evidence supports a conclusion that the restaurant's liability was derivative. Because its liability is derivative, the restaurant is entitled to full indemnification from the supplier and the trial court correctly ordered Etheridge to pay the full amount of the $400,000.00 judgment.